THAI PLASTIC BAGS INDUSTRIES CO., LTD., Plaintiff,

v.

UNITED STATES, Defendant,

and

Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation, Defendant–Intervenors.

Slip Op. 13–21.
Court No. 11–00086.

United States Court of
International Trade.

Feb. 11, 2013.

Irene H. Chen, Chen Law Group LLC, of Rockville, MD, and Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, for Thai Plastic Bags Industries, Co., Ltd.

Joseph W. Dorn, Stephen A. Jones, and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation.

Vincent D. Phillips and Ryan M. Majerus, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. Also on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Scott D. McBride, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*OPINION*

POGUE, Chief Judge:

Before the court is a determination by the United States Department of Commerce ("Commerce") in response to a pre- viously ordered remand.[1] In prior pro- ceedings, the court granted Commerce's request for a voluntary remand on two grounds: 1) to allow Commerce to provide additional explanation for its decision to assign a dumping margin of zero to all U.S. sales where export price was greater than normal value (referred to as "zero- ing") when calculating respondents' weighted-average dumping margins during the antidumping duty review at issue; and 2) to allow Commerce to consider the par- ties' comments and to review Commerce's application of the "transactions disregard- ed" cost adjustment when constructing a normal value in this review. *Thai Plastic Bags I,* —— CIT at ——, 853 F.Supp.2d at 1277–79.

For the reasons below, Commerce's *Re- mand Results* will be affirmed.

**STANDARD OF REVIEW**

█ This court will uphold Commerce's antidumping determinations if they are in accordance with law and supported by sub- stantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Where the antidump- ing statute does not directly specify a method for its application, the court will defer to Commerce's statutory construc- tion if it is reasonable. *Timken Co. v. United States,* 354 F.3d 1334, 1342 (Fed. Cir.2004) (relying on *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**DISCUSSION**

*I. Zeroing*

When comparing respondents' export prices to the merchandise's normal value

1. *See* Results of Redetermination Pursuant to Court Remand, ECF No. 92 (*"Remand Re- sults "*); *Thai Plastic Bags Indus. Co. v. United States,* —— CIT ——, 853 F.Supp.2d 1267 (2012) (*"Thai Plastic Bags I "*) (remanding *Polyethylene Retail Carrier Bags from Thai-* land, 76 Fed. Reg. 12,700 (Dep't Commerce Mar. 8, 2011) (final results of antidumping duty administrative review) and accompany- ing Issues & Decision Mem., A–549–821, ARP 08–09 (Mar. 1, 2011) (*"I & D Mem."*)).

in this review, Commerce treated sales made at or above normal value as not dumped; Commerce therefore did not aggregate the (negative) normal-to-export price differences of such sales with the (positive) normal-to-export price differences of the dumped sales made at prices below normal value. *I & D Mem.* cmt. 4 at 21.[2] Plaintiff Thai Plastic Bags Industries Company, Limited ("TPBI"), a respondent in this review, argued that Commerce acted contrary to law as articulated in the jurisprudence of the World Trade Organization ("WTO"). *See id.* at 20–21. Commerce rejected TPBI's WTO-based challenge on the ground that WTO jurisprudence *per se* is not a source of legal authority in the United States unless and until specifically implemented pursuant to the procedures established by the Uruguay Round Agreements Act. *Id.* at 22 (citing *NSK Ltd. v. United States,* 510 F.3d 1375, [1380] (Fed.Cir.2007); *Corus Staal BV v. United States,* 502 F.3d 1370, 1375 (Fed.Cir.2007); *Corus Staal BV v. Dep't of Commerce,* 395 F.3d 1343, 1347–49 (Fed.Cir.2005)).[3]

In this action, TPBI argued for remand because Commerce's refusal to aggregate *all* of the normal-to-export price differences of TPBI's U.S. sales, regardless of whether normal value exceeded the individual export prices, was inconsistent with Commerce's approach to aggregating price differences when calculating weighted-average dumping margins in initial dumping investigations. *Thai Plastic Bags I,* —— CIT at ——, 853 F.Supp.2d at 1277. Commerce requested a voluntary remand to explain its reasoning. *Id.* Noting two recent Court of Appeals decisions requiring further explanation for Commerce's apparently inconsistent application of the antidumping law in initial dumping investigations and subsequent administrative reviews, the court granted Commerce's request for a voluntary remand of this issue. *Id.* at n. 17 (citing *Dongbu Steel Co. v. United States,* 635 F.3d 1363, 1372–73 (Fed.Cir.2011); *JTEKT Corp. v. United States,* 642 F.3d 1378, 1384 (Fed.Cir. 2011)).

In its *Remand Results,* Commerce has provided additional explanation for its de-

---

**2.** To determine whether merchandise is being "dumped," 19 U.S.C. § 1677(34) (defining "dumped" and "dumping" as "the sale or likely sale of goods at less than fair value"), Commerce must make "a fair comparison" between the export price (which is sometimes constructed, *see id.* at § 1677a(b)) and the merchandise's "normal value." *Id.* at § 1677b(a) (providing instructions for calculating "normal value" that seek to "achieve a fair comparison with the export price or constructed export price"). The amount by which the normal value exceeds the export price is known as the "dumping margin." *Id.* at § 1677(35)(A). Commerce generally aggregates the various dumping margins determined for a given exporter or producer and divides this aggregate by the aggregate export prices of such exporter or producer to arrive at the weighted average dumping margin that will form the basis for antidumping duty assessment. *See id.* at §§ 1677(35)(B), 1673d(c)(1)(B)(i); *see also id.* at §§ 1673, 1673e(a)(1), 1673e(c)(3) (providing that anti-

dumping duties are assessed in an amount equal to the amount by which the normal value exceeds the export price for the merchandise).

**3.** *See, e.g., Corus Staal,* 395 F.3d at 1348 ("WTO decisions are not binding on the United States, much less this court.") (internal quotation marks and citation omitted); *id.* at 1349 ("[Congress] has authorized the United States Trade Representative, an arm of the Executive Branch, in consultation with various congressional and executive bodies and agencies, to determine whether or not to implement WTO reports and determinations and, if so implemented, the extent of implementation.") (citing 19 U.S.C. §§ 3533(f)–(g), 3538); *id.* ("[The court will not] overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme.").

termination not to aggregate the negative price margins of TPBI's non-dumped sales with the dumping margins of TPBI's dumped sales, notwithstanding the agency's approach to calculating weighted-average dumping margins in initial investigations. *Remand Results* at 2–13. TPBI continues to object to this determination. [TPBI]'s Comments on the Results of Redetermination Pursuant to Ct. Remand, ECF No. 98 ("TPBI's Br.") at 1–10. As explained below, however, Commerce has provided an explanation that comports with a reasonable reading of its statutory authority. Accordingly, the *Remand Results* will be affirmed on this issue.

## A. Background

Respondents in antidumping proceedings have long sought—and, until recently, Commerce has long declined—to offset the dumping margins of sales at less than fair value ("LTFV") with the negative normal-to-export price margins of non-dumped sales. *See, e.g., Serampore Indus. Pvt. Ltd. v. U.S. Dep't of Commerce*, 11 CIT 866, 873–74, 675 F.Supp. 1354, 1360–61 (1987) (addressing this claim and holding that "[a] plain reading of the [antidumping] statute discloses no provision for Commerce to offset sales made at LTFV with sales made at fair value" and that Commerce's interpretation of the statute "to prevent a foreign producer from masking its dumping with more profitable sales" was reasonable). Rather than offset the dumping margins of sales made at LTFV with the negative normal-to-export price margins of non-dumped sales, Commerce historically has interpreted "dumping" to mean that any sale *not* made at LTFV was not "dumped" and therefore had a "dumping margin" of zero. *See id.*; 19 U.S.C. §§ 1677(34) (defining "dumped" and "dumping" to "refer to the sale or likely sale of goods at less than fair value"), 1677(35)(A) (defining "dumping margin" as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise"). Commerce's policy of not permitting the dumping margins of dumped sales to be offset or negated by the negative normal-to-export price differences of non-dumped sales has accordingly come to be known, perhaps misleadingly, as zeroing.[4]

Responding to certain recommendations made by the WTO's Dispute Settlement Body,[5] however, Commerce determined that, in certain contexts, it will begin to

**4.** This label may be misleading because it suggests that non-dumped sales are entirely zeroed out and have no effect upon ultimate antidumping duty assessment rates. But "the weighted-average margin will reflect any non-dumped merchandise examined during the [period of review] [because] the value of such sales is included in the denominator of the weighted-average dumping margin while no dumping amount for non-dumped merchandise is included in the numerator[,] [such that] a greater amount of non-dumped merchandise results in a lower weighted-average margin." *I & D Mem.* cmt. 4 at 21.

**5.** Seventeen disputes concerning the practice of zeroing—fifteen of them filed against the United States—have been adjudicated to date in the WTO. World Trade Organization, Index of Disputes by Issue, http://www.wto.org/english/tratop_e/dispu_e/dispu_subjects_index_e.htm# selected_subject (last visited Feb. 7, 2013) (listing seventeen disputes under the topic "zeroing").

The heart of the dispute is definitional. The U.S. Trade Representative argued in the WTO, as Commerce does in its *Remand Results* here, that when dumping analysis is performed on a transaction-specific basis, any normal-to-export price comparison that yields a negative result indicates that the transaction in question was not a dumped sale; to treat the amount by which the export price of such a transaction exceeded normal value as a

aggregate all normal-to-export price comparisons, including the results of price comparisons for sales made at prices above normal value.[6] Due to its expressly limited applicability, one effect of this modification was that Commerce was now aggregating negative normal-to-export price comparisons in some contexts but not others. *See Dongbu*, 635 F.3d at 1365. In *Dongbu* and *JTEKT*, the Court of Appeals held that the reasonableness of interpreting the antidumping statute to allow for

such distinctions required more explanation than Commerce had then provided. *Dongbu*, 635 F.3d at 1373; *JTEKT*, 642 F.3d at 1384–85.

### B. Analysis

■ In a number of decisions post-dating *Dongbu* and *JTEKT*, this Court has affirmed Commerce's decision to include both positive and negative normal-to-export price differences when calculating weighted average dumping margins in ini-

---

negative dumping margin, and to permit this negative dumping margin to offset the dumping margins of dumped transactions, is contrary to the definition of dumping as selling at prices below normal value. *See, e.g.*, Appellate Body Report, *United States—Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, ¶¶ 32–33, 35, 46–47, WT/DS294/AB/R (Apr. 18, 2006); *Remand Results* at 12.

For the WTO's Dispute Settlement Body, on the other hand, dumping analysis by definition cannot be performed on a transaction-specific basis, and necessarily examines an exporter's pricing behavior over a certain period of time; by this definition of dumping as selling at *aggregate* prices below normal value, negative normal-to-export price comparisons are not negative dumping margins but relevant pricing behavior for determining overall dumping margins. *See, e.g.*, Appellate Body Report, *United States—Final Anti–Dumping Measures on Stainless Steel From Mexico*, ¶ 113, WT/DS344/AB/R (Apr. 30, 2008) (*"United States—Stainless Steel from Mexico"*) ("In our view, it is not correct to say that ... an 'offset' is provided for the so-called 'non-dumped' transactions. A margin of dumping is properly calculated under the Anti–Dumping Agreement only if all transactions are taken into account, including those where the export prices exceed the normal value.").

Although "[i]t is well settled that Appellate Body reports are not binding, except with respect to resolving the particular dispute between the parties," *United States—Stainless Steel from Mexico* at ¶ 158 (citation and footnote omitted), the Appellate Body has expressed "deep concern" regarding any de-

parture from "well-established [WTO] jurisprudence," *id.* at ¶ 162, which has reached "a definitive outcome" with respect to the definition of dumping and the practice of zeroing as such. Appellate Body Report, *United States—Continued Existence and Application of Zeroing Methodology*, ¶ 312, WT/DS350/AB/R (Feb. 4, 2009) (concurring opinion); *see also United States—Stainless Steel from Mexico* at ¶ 112 ("[W]hatever methodology is followed for assessment and collection of anti-dumping duties, ... the total amount of dumping found in all the sales made by the exporter concerned [must be] calculated according to the margin of dumping established for that exporter without zeroing.... [T]he terms 'dumping' and 'margin of dumping' cannot be interpreted as applying at an individual transaction level, as the United States suggests.") (citations omitted). *Compare with Timken*, 354 F.3d at 1342 ("Commerce calculates dumping duties on an entry-by-entry basis. Its practice of zeroing negative dumping margins ... neutralizes dumped sales and has no effect on fair-value sales.") (citing 19 U.S.C. § 1675(a)(2)); *Dongbu*, 635 F.3d at 1365 ("This court has opined that the statutory text ... is sufficiently ambiguous to defer to Commerce's decision of whether or not to use zeroing in both [antidumping investigations and administrative reviews].") (citations omitted).

6. *Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation*, 71 Fed. Reg. 77,-722, 77,722 (Dep't Commerce Dec. 27, 2006) (final modification); *see U.S. Steel Corp. v. United States*, —— CIT ——, 637 F.Supp.2d 1199, 1210–16 (2009) (affirming the modification), *aff'd*, 621 F.3d 1351 (Fed.Cir.2010).

tial dumping investigations but not when doing so in administrative reviews.[7] These holdings addressed Commerce's explanation regarding the inherent differences between the nature and goals of initial investigations and subsequent administrative reviews.[8] Here, Commerce clarifies that the reasonableness of its current practice is additionally supported by the distinction between the various comparison methods that Commerce may employ when comparing normal values and export prices to calculate dumping margins. *See Remand Results* at 10–13.

The antidumping statute contemplates three distinct methods that Commerce may employ when comparing normal values and export prices to calculate dumping margins. *See* 19 U.S.C. § 1677f–1(d). Commerce may 1) compare the weighted average of the normal values found during the relevant time period with the weighted average of contemporaneous export prices (the "average-to-average" comparison method), *id.* at § 1677f–1(d)(1)(A)(i); 2) compare the normal values of individual transactions to the export prices of individual transactions (the "transaction-to-transaction" comparison method), *id.* at § 1677f–1(d)(1)(A)(ii); or 3) compare the weighted average of the normal values to the export prices of individual transactions (the "average-to-transaction" comparison method), *id.* at §§ 1677f–1(d)(1)(B), 1677f–1 (d)(2). Commerce's recent policy modification is limited to the average-to-average comparison method.[9]

7. *Fischer S.A. Comercio, Industria & Agricultura v. United States*, —— CIT ——, 885 F.Supp.2d 1366, 1378–80 (2012); *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, —— CIT ——, 880 F.Supp.2d 1348, 1354–55 (2012); *Far E. New Century Corp. v. United States*, —— CIT ——, 867 F.Supp.2d 1309, 1312 (2012); *Grobest & I–Mei Indus. (Vietnam) Co. v. United States*, —— CIT ——, 853 F.Supp.2d 1352, 1361 (2012); *Union Steel v. United States*, —— CIT ——, 823 F.Supp.2d 1346, 1358–59 (2012). A number of additional actions challenging Commerce's practice in this regard have been stayed pending the outcome of appeal in *Union Steel*. *See, e.g., Papierfabrik August Koehler AG v. United States*, No. 11–00147, 2012 WL 6136890, at *5 (CIT Dec. 10, 2012); *Home Meridian Int'l, Inc. v. United States*, —— CIT ——, 865 F.Supp.2d 1311, 1331 n. 33 (2012) (collecting cases).

8. *See, e.g., Union Steel*, —— CIT at ——, 823 F.Supp.2d at 1359 ("[T]he court concludes that when it comes to reviews, which are intended to more accurately reflect commercial reality, Commerce is permitted to unmask dumping behavior in a way that is not necessary at the investigation stage."); *Grobest*, —— CIT at ——, 853 F.Supp.2d at 1361 (concluding that "Commerce has offered a reasonable basis for treating investigations and reviews differently"). *See also JTEKT*,

642 F.3d at 1384 (characterizing the "relevant question" as "why is it a reasonable interpretation of the statute to zero in administrative reviews, but not in investigations?"); *Dongbu*, 635 F.3d at 1370 (characterizing the issue presented as "the reasonableness of interpreting 19 U.S.C. § 1677(35) in different ways depending on whether the proceeding is an investigation or an administrative review").

9. *Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation*, 71 Fed. Reg. at 77,722 ("[Commerce] will no longer make average-to-average comparisons in investigations without providing offsets for non-dumped comparisons."); *see also Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings*, 77 Fed. Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012) (final modification) ("[Commerce] will calculate weighted-average margins of dumping and antidumping duty assessment rates in a manner which provides offsets for non-dumped comparisons while using monthly average-to-average [ ] comparisons in reviews...."). The modification for administrative reviews was not yet in effect at the time of the review at issue here. In any event, Commerce did not employ the average-to-average comparison method in this review. *See Remand Results* at 11 (not-

Commerce explains that when using the average-to-average comparison method, Commerce "does not determine dumping on the basis of individual, transaction-specific, U.S. prices, but rather makes the determination 'on average' for the averaging group [groupings are made by model and level of trade] within which higher prices and lower prices offset each other." *Remand Results* at 11. Commerce then "aggregates the comparison results from each of the averaging groups to determine the aggregate weighted-average dumping margin for a specific producer or exporter[,] [and] ... by permitting offsets in the aggregation stage, [Commerce] determines an 'on average' aggregate amount of dumping for the numerator of the weighted-average dumping margin ratio, consistent with the manner in which [Commerce] determined the comparison results being aggregated." *Id.*

When using the average-to-transaction comparison method, however, rather than analyzing overall pricing behavior, Commerce examines each export transaction individually. *Id.* Commerce "determines the amount of dumping on the basis of individual, transaction-specific, U.S. sales prices[,] ... compar[ing] the export price or constructed export price for a particular U.S. transaction with the average normal value for the comparable model of foreign like product at the same or most similar level of trade." *Id.* at 11–12. "The result of such a comparison evinces the amount, if any, by which the exporter or producer sold the merchandise into the U.S. market at a price which is less than its normal value[,] [and] ... [t]o the extent that the average normal value does not exceed the individual export price or constructed export price of a particular U.S. sale, [Commerce] does not calculate a dumping margin for that comparison, or include an amount of dumping for that comparison result in its aggregation of transaction-specific dumping margins." *Id.* at 12.[10]

Thus Commerce "has interpreted the application of average-to-average comparisons to contemplate a dumping analysis that examines the overall pricing behavior of an exporter or producer with respect to the subject merchandise, whereas under the average-to-transaction comparison method[ ] [Commerce] continues to undertake a dumping analysis that examines the pricing behavior of an exporter or producer with respect to individual export transactions." *Remand Results* at 12–13. Beyond providing for certain discrete limitations on the use of the average-to-transaction comparison method,[11] the statute is silent as to the particulars of when or how

---

ing that Commerce used the average-to-transaction method in this review).

**10.** Non-dumped sales remain relevant and accounted for because "[t]he value of any non-dumped sale is included in the denominator of the weighted-average dumping margin while no dumping amount for non-dumped transactions is included in the numerator[,] [so] a greater amount of non-dumped transactions results in a lower weighted-average dumping margin." *Id.* at n. 26.

**11.** Commerce may employ this method in dumping investigations only if "(i) there is a

pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) [Commerce] explains why such differences cannot be taken into account using [either the average-to-average or the transaction-to-transaction method]." 19 U.S.C. § 1677f–1(d)(1)(B). When employing this comparison method in administrative reviews, Commerce must "limit its averaging of [normal value] prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale." *Id.* at § 1677f–1(d)(2).

Commerce should apply one or another of the different comparison methods. *See* 19 U.S.C. at § 1677f–1(d). Commerce's approach to, and explanation for, distinguishing among these comparison methods—based on the differences between an analysis of overall pricing behavior and an analysis of individual export transactions—is reasonable. Commerce has thus sufficiently supported its policy of including negative-value price comparisons in calculations based on the average-to-average comparison method while disallowing offsets for non-dumped sales when using the average-to-transaction or the transaction-to-transaction comparison methods.

Accordingly, because Commerce's determination not to aggregate the price differences of TPBI's above-normal value sales with the dumping margins of TPBI's dumped sales (while employing the average-to-transaction comparison method in this review) comports with a reasonable interpretation of the statute, this determination is affirmed. *See Timken*, 354 F.3d at 1342.

## II. *Transactions Disregarded Rule*

When constructing normal value for TPBI's merchandise, Commerce *sua sponte* changed its application of the "transactions disregarded rule"[12] in the interim between the preliminary draft and the final results of this review. *Thai Plastic Bags I*, —— CIT at ——, 853 F.Supp.2d at 1278. The court granted Commerce's request for voluntary remand to allow Commerce to review its application of this rule and provide the parties with an opportunity to comment on this question. *Id.* at 1278–79. In doing so, the court noted that while no provision directly addresses how to apply the transactions disregarded rule (beyond requiring a cost adjustment for materials purchased from an affiliated supplier below market price), Commerce's application of the rule in the final results of this review appeared contrary to the agency's past practice. *Id.* at 1279 n. 23.[13]

On remand, Commerce determined that its application of the transactions disregarded rule in both the preliminary and the final results of this review was contrary to past agency practice, resulting in inaccurate dumping margins. *Remand Results* at 18. Commerce therefore decided to apply the rule in a manner that is consistent with agency practice. *Id.*[14] Specifically, when constructing TPBI's normal value in both the preliminary and the final

**12.** *See* 19 U.S.C. § 1677b(f)(2). When Commerce determines that the circumstances do not permit normal value to be calculated pursuant to 19 U.S.C. § 1677b(a)(1), normal value may be constructed based on the costs of producing the subject merchandise. *Id.* at §§ 1677b(a)(4), 1677b(e). When analyzing respondents' costs of production while constructing normal value under 19 U.S.C. § 1677b(e), Commerce may disregard below-market value transactions between affiliated parties. *See id.* at § 1677b(f)(2) (the "transactions disregarded rule").

**13.** (citing *Certain Pasta from Italy*, 69 Fed. Reg. 6255 (Dep't Commerce Feb. 10, 2004) (notice of final results of the sixth administrative review of the antidumping duty order and determination not to revoke in part) and accompanying Issues and Decision Mem., A–475–818, ARP 01–02 (Feb. 3, 2004) at cmt. 32).

**14.** TPBI argues that Commerce fails to cite to any relevant prior practice because it refers to proceedings where Commerce applied the major input rule, 19 U.S.C. § 1677b(f)(3), rather than the transactions disregarded rule, *id.* at § 1677b(f)(2). TPBI's Br. at 13 n. 2. But TPBI is incorrect. As Commerce correctly emphasizes, *Remand Results* at 17, the material difference between the major input rule and the transactions disregarded rule is that the major input rule applies to purchases from an affiliated input *producer*, whereas the transactions disregarded rule applies when

results of this review, Commerce applied a single adjustment equally across all models of TPBI's merchandise (regardless of the type of resin used in producing the various models), even though Commerce found that only one of the three types of materially different resin inputs purchased by TPBI during the period of review was purchased from an affiliate below market value. *See id.* at 29.

In the *Remand Results,* on the other hand, Commerce determined that, because "the amount and type of inputs that are used to produce a [plastic] bag have a direct impact on the ultimate cost to produce that bag, and the ultimate price paid to purchase that bag," *id.* at 28, and because "the inputs were used by TPBI in significantly varying quantities in producing different types of bags during the period of review," *id.,* it was more accurate to adjust each model's cost data based on each model's consumption of the one type of resin found to have been acquired below market value, consistent with past agency practice. *Id.* at 30 (explaining that "[t]his analysis is more accurate and specific than that applied in either the *Preliminary Results* or the *Final Results,* and is consistent with [Commerce]'s practice in applying the transactions disregarded rule to

products with significant inputs where these significant inputs are consumed in disproportionate quantities in the production of the different products subject to review").[15]

TPBI objects to Commerce's application of the transactions disregarded rule in the *Remand Results,* arguing that "Commerce has deprived TPBI of a fair and reasonable opportunity to present its views on Commerce's analysis in the *Final Results.*" TPBI's Br. at 12.[16] But Commerce presented its reasoning with regard to this issue in its proposed draft remand determination, which the agency released for the parties' consideration prior to finalizing the *Remand Results.* Nothing prevented TPBI, when commenting on the draft remand determination, from arguing that Commerce's approach in the preliminary or final results of this review was superior to that proposed in the draft remand determination. *See Remand Results* at 27. TPBI made no such arguments. *Id.*

TPBI also objects to Commerce's request of additional information from TPBI during the remand proceeding. TPBI's Br. at 12–13. TPBI argues that, by requesting this information, Commerce vio-

---

the affiliated party did not produce the materials being sold. Aside from this distinction, both rules allow Commerce to make a cost adjustment for undervalued purchases from affiliates when constructing normal value and, for both rules, the statute is equally silent with regard to the manner in which the resulting cost adjustment is to be applied when constructing normal value for subject merchandise comprised of multiple models consuming varying amounts of the input in question. *Compare* 19 U.S.C. § 1677b(f)(2) *with id.* at § 1677b(f)(3). Here, Commerce applied the transactions disregarded rule rather than the major input rule because TPBI's affiliate did not produce the resin sold in the transactions at issue. *Remand Results* at 14 n. 28.

**15.** To effectuate this application of the transactions disregarded rule, Commerce requested additional information from TPBI, which TPBI promptly provided. *Id.* at 15–16.

**16.** (citing *Zenith Elecs. Corp. v. United States,* 12 CIT 932, 699 F.Supp. 296 (1988) (preliminarily enjoining Commerce from altering instructions concerning the cash deposits of estimated antidumping duties pending litigation of the final results of an antidumping proceeding)).

lated the court's remand order. *Id.* at 13. The court's remand order granted Commerce's request for a voluntary remand "to reconsider its position" with regard to its application of the transactions disregarded rule in this review.[17] Having obtained the court's permission to reconsider its application of the transactions disregarded rule, Commerce exercised its inherent discretion to request additional information within TPBI's possession that was reasonably necessary to permit the agency to apply the rule with greater accuracy and consistency. *See Remand Results* at 15–16, 30; *NSK Corp. v. United States,* —— CIT ——, 774 F.Supp.2d 1296, 1298 n. 4 (2011) (noting that agencies have "inherent discretion to reopen the record" with respect to issues remanded for reconsideration); *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,* —— CIT ——, 625 F.Supp.2d 1339, 1356 n. 18 (2009) (noting that, "[a]lthough Commerce is not being expressly required to reopen the administrative record [with regard to the remanded issue], the agency clearly has the discretion to do so if appropriate").

Commerce's explanation for applying 19 U.S.C. § 1677b(f)(2) more precisely on remand, resulting in greater accuracy and consistency with prior agency practice, is reasonable. Accordingly, the *Remand Results* are affirmed on this issue.

17. *Thai Plastic Bags I,* —— CIT at ——, 853 F.Supp.2d at 1278–79 ("As an agency may request a remand *to reconsider its position,* the court will remand this issue ....") (emphasis added) (citing *SKF USA, Inc. v. United States,* 254 F.3d 1022, 1028 (Fed.Cir.2001)); *see also* Def.'s Resp. in Opp'n to Pls.' Rule 56.2 Mots. for J. Upon the Agency R., ECF

## CONCLUSION

For all of the foregoing reasons, Commerce's *Remand Results* are affirmed. Judgment will be entered accordingly.

No. 67, at 43 (requesting a voluntary remand to, *inter alia,* "reconsider [Commerce's] analysis in applying the transactions disregarded rule").